# EXHIBIT B

<u>IN THE MATTER OF THE ARBITRATION ACT 1996</u>
<u>AND</u>
<u>IN THE MATTER OF AN ARBITRATION</u>

**BETWEEN**

## WISDOM MARINE LINES SA

<u>Claimant</u><br>("Seller")

and

## ARABIAN GAS & DEVELOPMENT COMPANY (AGODCO)

<u>Respondent</u><br>("Buyer")

**Namura Hull 388 tbn "Eco Rimfire" – MOA dd 29 November 2013**

---

### SECOND PARTIAL FINAL AWARD

---

**Introduction**

1.   This is the Second Partial Final Award of the arbitration tribunal comprising the undersigned Ian Gaunt of 61 Cadogan Square, London SW1X 0HZ (the "**Tribunal**") in an arbitration arising from disputes under a Memorandum of Agreement on modified Saleform 1993 terms dated 29 November 2013 (the **"MOA"**) by which the Claimant Wisdom Marine Lines SA as seller (the **"Seller"**) agreed to sell to the respondent Arabian Gas & Development Company (AGODCO) as buyer (the "**Buyer**") the vessel known as Handy BC hull no 388 (the "**Vessel**") under construction at the shipyard of Namura Shipbuilding Co Ltd Japan (the "**Shipyard**") pursuant to a shipbuilding contract dated 26 July 2013 (the "**SBC**") made between the Shipyard and the Seller.

2.    The MOA provided so far as material as follows:

"*2 . ~~Deposit~~ Down Payment*

*As security for the correct fulfilment of this Agreement the Buyers shall pay a ~~deposit of 10~~ 20 % (~~ten~~ twenty per cent) of the Purchase Price, USD5,250,000.. free of bank charge, non-interest bearing, being the down payment, to the Sellers nominated account, within 3... banking days fro a fax/~~email~~ copy of the MOA has been signed by both parties. ~~The date of thisAgreement…~~*

*3. Payment*

*The Buyers shall, no later than .. 3 business days prior to the scheduled delivery date of the Vessel, remit the balance of the purchase money including payment for unused bunkers remain on board and additional extra payment, if any, into the Buyers suspense account in Sellers' nominated Bank. The Buyers will provide all necessary documents as requested by the Sellers' nominated Bank for the opening of the suspense account."*

*8. Documentation*

*The place of closing and exchange of the delivery documents to be held in the Sellers nominated Bank. The physical delivery of the Vessel and the related closing may be at different venues, but the closing and the delivery for respective Vessel will take place at the same date and time.*

*The addendum number 1 to the MOA of the vessel and to be mutually agreed within 4 weeks from the date of this Agreement and the 20% down payment having been lodged."*

*11. Condition of delivery*

*The Vessel with everything belonging to her shall be at the Seller's risk and expense until she is delivered to the Buyer, but subject to the terms and conditions of this*

*Agreement shall be delivered and taken over by the Buyers "as is" at time of delivery from the Builders when the class certificate is ready [standard text deleted] However, the Vessel shall be delivered in accordance with the Shipbuilding Contracts (sic) and specifications being Appendix 1 as attached herein.*

*On delivery, Vessel will have present a full set of standard NK class certificates for a Newbuilding bulkcarriers (sic) of this description.*

*All instruction books, drawings, plans and manuals on board or ashore in owners of their managers possession are to be delivered to the Buyers..."*

*16. Arbitration*

*This Agreement shall be governed by and construed in accordance with English law and in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force, one arbitrator being appointed by each party. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within 14 days, failing which the decision of the single arbitrator appointed shall apply. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.*

*If any dispute should arise in connection with the interpretation and fulfilment of this agreement, London arbitration and English law to apply as per NSF 2012, clause 16a)...[1]*

*Japanese law however to remain in force for the Shipbuilding contract and any additional documentations and/or specifications agreed between the Sellers and Namura Shipyard."*

---

[1] The terms of clause 16a) of the 2012 version of the Norwegian Saleform are in all material respects identical to those of the 1993 version except that they contain a reference to the Arbitration Act 1996 and the requirement that the arbitration is to be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced

3

**Factual background**

3. Following the signature of the MOA the 20% deposit (USD5,250,000) was lodged by in the form of a payment by "Saudi Chemicals Inc" ostensibly on behalf of the Buyer in accordance with the terms of the MOA.

4. The parties did not agree on the list of documents contemplated by clause 8 of the MOA within the 4 week period referred to in clause 8.

5. The Buyer nominated the flag of the Vessel (communicated by its broker's e mail message of 14 April 2015). On various occasions during the course of 2015 the Buyer was asked to agree to a list of delivery documents for the purposes of clause 8 but, through brokers, the Buyer stated on 13th July 2015 that it was too early to do so and that they would revert *"in September"*.  The Buyer did not revert.

6. In or about November 2015 the Seller received notice that the technical management agreement between the Buyer and Brave Management Corp Inc had been terminated and no new manager appointed. Thereafter, as the Vessel approached sea trials in January 2016, the Seller asked the Buyer to confirm arrangements for the supply of lub oil to the Vessel which the Buyer was required to provide under the terms of the MOA. The Buyer did not do so. The seller provided lub oil to the Vessel which proceeded through sea trials and was tendered for delivery to the Buyer.

**The arbitration**

7. The Seller commenced arbitration under the MOA claiming initially the cost of the lub oil supplied to the Vessel. The Seller served claim submissions in the reference and in its Defence and Counterclaim submissions served in February 2016 the Buyer for the first time contested the validity of the MOA on the basis that there had remained certain matters relating to the documentation for the registration of the Vessel which had not been agreed and that therefore the MOA had not come into effect. Further the Buyer alleged that the name AGODCO was not that of an incorporated entity but that the name had been used by a Bahrain registered corporation named Arabian Worldwide Ventures SPV ("**AWV**") of which AGODCO was a sometime trading name.

4

8.     The Tribunal published its partial final award dated 9 March 2016 in which the Tribunal held that the MOA had become unconditional and binding.

9.     The parties served further and amended Claim, Defence and Reply Submissions in which the Seller alleged that the Buyer was not AWV but an unincorporated association or other unincorporated body of persons comprising or including Mr Harry Vafeias of Piraeus, Greece and/or Brave Maritime Corporation Inc, ("**Brave**").

10.    The Seller initiated further arbitration proceedings naming Mr Vafeias and Brave Maritime  as respondents in relation to the same claims as are the subject of the present arbitration proceedings. In this arbitration the tribunal comprises Mr Ian Gaunt and Mr Michael Baker-Harber. The Seller has also initiated arbitration proceedings against the directors /managers of AWV, Mr Terry Antoniadis, Mr Adam Harcourt and Mr Robert Di Figlio. In that reference the tribunal comprises Mr Ian Gaunt, Mr David Aikman and Mr Michael Allen. Each of the said respondents has challenged the jurisdiction of the tribunals so appointed.

11.    This arbitration reference and the other arbitration references referred to above are being conducted in parallel with arbitration references concerning the same parties in relation to Namura Hull 387 ("**Hull 387**") which was also the subject of a sale by the Seller to the Buyer. Mr Michael Allen is the sole arbitrator in the reference concerning Hull 387. Mr Allen was initially appointed as umpire in that reference by the party appointed arbitrators, Mr Ian Gaunt and Mr David Aikman, and assumed the position as sole arbitrator in that reference following the failure of Mr Gaunt and Mr Aikman to agree on a matter in relation to that arbitration as notified to the parties under paragraph 9(e) of the LMAA Terms.

12.    In the present arbitration proceedings the Seller has alleged that the Buyer (whose identity is to be determined by the Tribunal in due course) has wrongfully refused to accept delivery of the Vessel when tendered. The Buyer has alleged that the Vessel was not in a condition in which it was required to take delivery and pay the balance of the purchase price under the MOA.

13. Following the refusal of the Buyer to take delivery of the Vessel, the Seller procured the transfer of title of the Vessel to its wholly owned Panamanian incorporated subsidiary Daiwan Kalon S.A. ("**Daiwan Kalon**") for a notional price of USD20.9 million, which was equal to the price at which the Seller had contracted to acquire the Vessel from the Shipyard under the Shipbuilding Contract. The details of the transaction for the acquisition of the Vessel by Daiwan Kalon are further described below.

14. The Seller claims that as a result of the wrongful repudiation of the MOA by the Buyer it has suffered loss and damage to be assessed by reference to the price of the Vessel under the MOA less the market value of the Vessel at the date of the breach. The Buyer claims that the effect of the transfer of the Vessel to Daiwan Kalon at a price of USD20.9 million is to eliminate all but a small part of the damage claimed by the Seller after taking account of the deposit paid by or on behalf of the Buyer (on the assumption that the Seller is entitled to retain this).

15. The Tribunal is satisfied that it has power under section 47 Arbitration Act 1996 to make this, a partial award, in the absence of contrary agreement.

16. A hearing of the issues which are the subject of this Second Partial Award was ordered and held at the International Dispute Resolution Centre, 70 Fleet Street, London EC4Y 1EU from 14 to 18 May 2018, concurrently with the hearing of the reference concerning Hull no 387. The parties were represented at the hearing by solicitors and counsel. At the hearing the Tribunal heard witness evidence from Mr Bruce Hsueh Finance Director of the Seller and expert evidence on valuation from Mr Patrick Booth of Booth Shipping Co. Ltd for the Seller and Mr Anthony English of English White Shipping Limited for the Buyer and on the subject of the alleged defects in the Vessel from Mr Herman Eijkelenboom of Brookes Bell for the Seller and Mr Tony Grainger of TMC Marine for the Buyer.

**Condition of the vessel on delivery**

17.  It is the Buyers' case that Seller was in breach of clause 11 of the MOA "*Condition on delivery*".  The Buyer was only obliged to take over the Vessel if it was contractually compliant at the point of tendering the Notice of Delivery.  If there were defects which were not "*de minimis*" at the time the Vessel was tendered for delivery then the Vessel would not have been contractually compliant.  Further, it was also originally the Buyer's case that the Sellers were in breach of clause 15, "*Buyers' representatives*" in relation to supervision and also clause 18, communication to the Buyers of "*each and every issue arising under the Shipbuilding Contracts during construction... which may have an effect on the vessel or the terms of this MOA*".  By the end of the hearing, the Buyer accepted that supervision and communication within the terms of clauses 15 and 18 were no longer live issues and no longer provided a justification for the Buyer's claim to reject the Vessel or treat the Seller as in repudiatory breach.

18.  The Seller's case is that the Buyer had no right to reject the Vessel if, as pleaded in the Buyer's Defence and Counterclaim Submissions, the Vessel had not "*been constructed in exact conformity with every aspect of the SBC and Specification* ".  The Buyer was not afforded any right to reject the Vessel under the SBC and the Sellers say that even their own rights of rejection against the Shipyard are limited in terms of the type of defect.

19.  Article V1 of the SBC (Trials) gave the Seller as buyer under the SBC  the right to reject the Vessel after the sea trials if there was a non-conformity with the SBC and Specifications "*in substantial aspect*" after the Shipyard had the opportunity to correct it.  Article V1 (b) provides:-

>  "*It is specifically agreed that non-conformity as entitling the Buyer to reject the VESSEL shall not embrace such minor or insubstantial degree of non-conformity that is as so judged from the view point of the Builder's standard shipbuilding practice, it being agreed than non-conformity in minor or*

7

*insubstantial nature shall be rectified by the Builder as soon as practicable after the delivery of the VESSEL."*

20.    The Seller says that the Vessel was deliverable "as is" and there was no right to reject. Alternatively, the Vessel could only be rejected if there was a very serious breach of clause 11 of the MOA going to the root of the contract or, as a further alternative, if there were major or substantial defects.  There could be no rejection for minor or insubstantial defects judged by reference to the Shipyard's standard. The Seller maintains that there were no defects which gave rise to a right to reject the Vessel within these parameters.

**Evidence as to condition**

21.    The Seller instructed Mr Eijkelenboom of Brookes Bell Shanghai. He produced a report dated 31 May 2017 together with a supplemental report dated 4 May 2018.  Mr Eijkelenboom attended the yard between 24 and 26 February 2016 but was not present when the Vessel was delivered.  However, he was told by the Shipyard that no remedial work had been carried out from the moment the Vessel was tendered for delivery.

22.    The Buyer instructed as its expert Mr Grainger of TMC Marine. He produced a report dated 31 May 2017 and supplemental reports dated 4 May and 14 May 2018.  Mr Grainger did not inspect the Vessel and his reports are based purely on the documentation made available to him.

23.    Mr Simou, a freelance surveyor engaged by Independent Surveys on behalf of the Buyer through Brave Maritime SA, attended on board the Vessel during sea trials between 11 and 13 February 2016.  He was accompanied by Mr Terzoglou of Alpha Marine Consulting.

8

24.   The photographs and observations "*BUYERS INSPECTION REMARKS*" dated 14 February 2016 attached both to Mr Simou's witness statement dated 10 May 2017 and the Defence and Counterclaim Submissions, listed 53 "*defects/problems/non-compliances identified during our inspection and sea trials*".

25.   Messrs Simou and Terzoglou also produced a schedule "*S.388 M/V "ECO RIMFIRE"*" noting 54 comments and defects in respect of the vessel as at 15 February 2016, the day before scheduled delivery of Hull 387.   The majority of these are also listed in the observations dated 14 February 2016.

26.   Mr Eijkelenboom and Mr Grainger conducted a meeting via Skype on 9 June 2017 and produced a joint memorandum dated 12 June 2017 (the "**joint memorandum**") in which, inter alia, they set out their opinions on the lists of defects produced by the Buyer.  The numbering in the joint memorandum follows the paragraph numbering in Mr Eijkelenboom's report of 31 May 2017.

27.   Both experts agreed in the joint memorandum that some of the items listed by Mr Simou and Mr Terzeglou were either not defects, There were other instances such as "the bilge well to be cleaned" and "the origin of water leakage to be identified", where Mr Eijkelenboom stated that the bilge was clean when he attended but Mr Grainger was unable to verify it.

28.   On others, there was a clear difference of opinion between Mr Eijkelenboom and Mr Grainger as to whether or not there was a defect at all which might require rectification.

29.   Where a defect had been identified and agreed between the experts, there were instances where Mr Eijkelenboom was of the opinion that the defect could have been rectified before or soon after delivery.  Whilst Mr Grainger agreed in principle, he

reserved his opinion on the Vessel's actual delivered condition until he had seen proof of defect rectification from the Shipyard.

30.   Both Mr Eijkelenboom and Mr Grainger agreed that whilst there were some "*deficiencies*", there were "*no defects which would be described as major*".  As stated above, it is the Buyer's case that if there were defects which were not "*de minimis*" at the time the Vessel was tendered for delivery, then the Vessel would not be contractually compliant.

31.   The experts fundamentally disagreed whether a newbuild project could be realized without *any* defects during construction.  Mr Eijkelenboom's opinion was that it was possible whereas Mr Grainger regarded it as highly unlikely.

32.   The experts also fundamentally disagreed on whether a single person could effectively supervise the concurrent construction of two vessels.  Mr Grainger's opinion was that a single person could not properly do so; Mr Eijkelenboom disagreed.  However, as set out above (paragraph 17), the alleged inadequacy of supervision was no longer part of the Buyer's case by the end of the hearing.

33.   Mr Eijkelenboom and Mr Grainger gave evidence at the hearing and were cross examined on their opinion on the deficiencies/defects where they had not reached agreement as well as confirming those where there was, effectively, agreement.

34.   What follows is not intended to be an exhaustive examination of each and every item in the joint memorandum.  Rather, it will pick up representative items referred to by the parties and their experts during the course of their evidence to support the Tribunal's conclusion on the condition of the Vessel on delivery and whether or not the Buyers had a right to reject.

**Items generally agreed**

35.  There were a number of what might be regarded as more minor items where there was agreement between the experts.

36.  Where Mr Grainger had not seen, or was unaware of, evidence, he was prepared to accept that his report was based on the fact that he had seen no evidence of compliance with the LSA code.  When asked, however, he accepted Mr Wang's evidence in the latter's statement that the life jackets photographed were shipyard equipment, used temporarily for sea trials, and the life jackets delivered to the vessel had been checked by Class, NK.

37.  More generally, Mr Grainger accepted that where Mr Wang and Mr Eijkelenboom had given evidence about defects having been rectified or defects not being present at later stages when they looked at the Vessel then Mr Grainger had no basis for disagreeing with what they said because he had not seen the Vessel.

38.  There were other instances where there remained a difference of opinion between Mr Grainger and Mr Eijkelenboom,.  However, Mr Grainger accepted that six engineers would probably have six different opinions on the point and that views different from his own were not unreasonable.

39.  Beyond this, there were a number of specific issues where the experts remained opposed to one another.

11

**Bilge well**

40.    A disputed item between the experts was, "whether there should be a bilge well and alarm in the steering gear compartment".   The joint memorandum noted that Mr Eijkelenboom considered that there was compliance with the specification. He was under the impression that a bilge well was present but Mr Grainger could not verify this.

41.    Mr Eijkelenboom's evidence at the hearing was that the photograph showed a small bilge well with a grating, painted green.  Removing the grating gave access to a suction line leading to the engine room and a hand pump.  There was no alarm nor did Mr Eijkelenboom consider that an alarm was required.  Whilst SOLAS required bilge level alarms for unattended machinery spaces, he did not consider the steering gear compartment to be a machinery space because SOLAS required the steering gear to be separated from the machinery spaces and therefore it was not a machinery space.  If it was a machinery space then Mr Eijkelenboom agreed that there should be an alarm in the bilge well.

42.    Mr Grainger's evidence was that his interpretation of SOLAS was that the steering gear compartment was a machinery space which should therefore have a bilge well and a bilge alarm.  What he saw in the photograph of the steering gear compartment was a scupper, not a bilge well, which was being led to a bilge well in the engine room.

43.    It was put to Mr Grainger that if NK accepted that the steering gear compartment was a machinery space then there was a requirement for a bilge well and a bilge well alarm to comply with SOLAS. The fact NK had not done so was a strong indication that the SOLAS requirement did not apply to the steering gear compartment.  Mr Grainger's response was that was not his opinion and that classification societies are not infallible. Mr Grainger accepted that if he was correct then the implication was a basic error or mistake by NK or a misinterpretation of the rules.

12

44. The class approved pumping drawings produced after the experts had completed their evidence appeared to confirm that the steering gear compartment was fitted with a scupper and scupper pipe leading to a bilge well in the engine room.  In any event, there was no bilge well alarm in the steering gear compartment.

45. The piping arrangement had been approved by NK. Whether or not there was a breach of SOLAS on the assumption that this was a machinery space, the Tribunal does not consider that the absence of a bilge alarm to be sufficient grounds for the Buyers to refuse to take delivery of the Vessel.  Whilst classification societies may not be infallible the responsibility for the SOLAS approval and certification was that of the classification society. It had not made any reservations in this context and in its judgement it was apparent to the Tribunal that the arrangement had been judged by the competent authority responsible for its approval to be complaint with SOLAS.

**Other condition items**

46. There were various other items where there remained disagreement between the experts.

47. Complaints were made about vibrations in the crane mast and jib.  The experts were unable to verify whether the yard repair was successful although they acknowledged that an arrangement had been put in place to attempt to prevent vibration.  Mr Grainger said that the only way to confirm whether it was successful was by conducting a further sea trial which he would have recommended to the Buyer had he been instructed at that time.  Mr Eijkelenboom's evidence was that it was common practice for vibration issues to be verified by the crew after delivery.

48. A similar situation arose in relation to vibration of the stern flag post, although Mr Grainger accepted that a sea trial would not be expected for an item such as this.

49.  Mr Grainger considered the absence of ladder rings on crane posts to be a safety hazard. Initially, Mr Grainger had assumed that external ladders were the primary means of access to the tops of the cranes and cabins. Subsequently, evidence of internal ladders with safety rings was produced which Mr Grainger accepted as being compliant.   However, he did not accept that the external ladders from the middle level to the top level complied with Australian regulations.  It was put to him that those regulations did not apply because access to the very top of the crane was only ever going to be required for maintenance and inspection, not for normal operation.  Further, anyone requiring access would be wearing personal safety equipment.

50.   It was also complained that there was an absence of access platforms to allow observation of cargo loading.  Mr Eijkelenboom was originally of the opinion that this complied with the specification whereas Mr Grainger considered that there should be some safe means of access.  Mr Eijkelenboom conceded during his evidence that he had found photographic evidence that there were in fact platforms at the forward ends of the hatch covers.  Whilst in his report he explained that there should be as few obstructions as possible outboard of the hatch coamings as the vessel was laid out for carriage of logs, he now accepted that it was good to have platforms integrated into the construction.

**Conclusion on condition**

51.  The Tribunal accepts that the parties' amendments to the standard wording of the Norwegian Saleform 1993 materially restricted the right to reject the Vessel on the grounds of condition to a *serious* breach of clause 11 or a *major* defect.  As a matter of construction, the effect of the inclusion in clause 11 of the reference to delivery in accordance with the SBC and specifications was to incorporate the "*substantial aspect*" test for non-conformity as provided in Article V1 4(b) of the SBC and to remove the "*minor or insubstantial degree of non-conformity*" as a ground for rejection, such items to be rectified by the Shipyard  as soon as practicable after delivery.

14

52. Whilst the Tribunal accepts that there were items which may have required rectification by the Shipyard following delivery, the experts had agreed before the hearing that none could be described as "*major*".  Although the experts could not reach agreement on a number of others, nevertheless, the Tribunal does not consider any of these to have been other than minor or insubstantial or not capable of being rectified by the Shipyard after delivery.

53. Having carefully considered all the matters raised in the experts' reports, their evidence at the hearing and the parties' submissions, the Tribunal finds and holds that the condition of the Vessel was not such that gave the Buyer a right to reject her.

**The Buyer's breach**

54. It follows that the Buyer was in repudiatory breach of the MOA when it failed to take delivery of the Vessel when she was tendered for delivery by the Seller.

55. The Seller has argued, and we agree, that the Buyer was also in repudiatory breach of the MOA by failing to make the deposit of the balance of the purchase price of the Vessel when required to do so under clause 3 of the MOA.

**Quantum**

56. The Seller claims the following as arising from the Buyer's repudiatory breach of the MOA:

(1) USD11.75 million, being the difference between the MOA price of USD26.25million and an alleged market price at the date of repudiation/termination of the MOA of USD14.5 million; and

(2)  USD135,000 in detention costs under clause 13 of the MOA in relation to the period between the date when the Vessel was tendered for delivery and the date when the MOA was terminated; and

(3) USD27,000, being the cost of makng alterations to the Vessel in order to be able to register it in the name of Daiwan Kalon.

57.  The Seller submits that the provisions of section 50(3) of the Sale of Goods Act 1979 are prima facie applicable in this situation. Section 50 provides:

"(1)  Where the buyer wrongfully neglects or refuses t accept and pay for the goods, the seller may maintain an action against him for damages for non-acceptance.

(2)   The measure of damages is the estimated loss directly and naturally resulting, I the ordinary course of events, from the buyer's breach of contract.

(3)   Where there is an available market for the goods in question the measure of damages is prima facie to be ascertained by the difference between the contract price and the market or current price at the time or times when the goods ought to have been accepted or (if not time was fixed for acceptance) at the time of the refusal to accept."

58.  It is said by the Seller that this provision reflects the usual common law rule that on a breach of contract the innocent party, in this case the Seller, is entitled to be put in the position he would have been in had the contract been performed: Robinson v Harman [1848] 18 LJ Ex 202.

59.  Based on the evidence of its expert Mr Booth, the Seller claims that there was an available market for the Vessel in the sense of an market for ships which were sufficiently similar in specification and place of build as the Vessel within what is claimed to be a reasonable time of the breach in this case. It is asserted that there can be an available market even though prices are low or very low: Bradley & Sons Ltd v Colonial and Continental Trading Ltd [1964] 2 Lloyd's Rep 52 at 64.

60.   The Seller argues in the alternative that if there is no available market that can be used to quantify losses, the seller is entitled to the damages to compensate it for the loss " directly  and naturally resulting , in the ordinary course of events" from the breach and that in almost all cases a seller's loss will be the difference between the contract price ad the value of the goods to the seller at the time and place of the breach: <u>Harlow and Jones Ltd   v Panex (International) Ltd</u> [1967] 2 Lloyd's Rep 509, 530 and <u>AerCap Partners 1 Ltd  v Avia Asset Management AB</u> [2010] EWHC 2431, paras 105-117.

61.   Based on the evidence of its expert Mr English, the Buyer argues that there was no available market for the ships of the characteristics of the Vessel at the time of breach or within a reasonable period thereafter. The Buyer claims that, immediately on taking delivery of the Vessel from the Shipyard, the Seller on-sold the Vessel to it subsidiary Daiwan Kalon for USD20.9 million. It is argued that as this was the same price as that paid by the Seller to the Shipyard the loss sustained by the Seller from the Buyer's breach of the MOA is no more than USD5.35 million, being the difference between the purchase price payable under the MOA and the price at which the Seller on-sold the vessel to Daiwan Kalon. Since the Seller has been paid the down payment of USD5.25 million, which it is acknowledged that the Seller is entitled to retain, the only further payment due to the Seller is the cost of USD135,000 and  USD27,000, being the cost attributable to the changes need to be able to register the Vessel in the name of Daiwan Kalon.

62.   In response the Seller argues that the sale to Daiwan Kalon was not at arm's length and that the position adopted by the Buyer is "artificial and wrong". It argues that Daiwan Kalon is a single purpose company wholly owned by the Seller and that therefore any loss suffered by Daiwan Kalon as a result of the buyer's breach amounts to a dollar-for-dollar equivalent loss to the Seller as 100% owner of the shares of Daiwan Kalon and can be claimed by the Seller as damages accordingly.

17

63.    The Seller contends that the Buyer's characterisation of the arrangement with Daiwan Kalon as a "sale" is incorrect and that the Seller viewed the transaction with its subsidiary as a mere "transfer" of rights under the SBC, including ownership, in keeping with the Seller's normal practice of putting newbuildings in the ownership of single purpose, wholly-owned, subsidiaries.

**Expert evidence on valuation**

64.    It was accepted by the experts on both sides that the question of whether there was an available market for the Vessel in February 2016 is a matter of law as far as the determination of the parameters for defining the relevant market are concerned. Mr Booth suggested that the "market" which might be appropriate was a market for bulk carriers of similar size wherever built of up to 4 years old. Mr English suggested that the relevant market should be taken as a market for Japanese built handy sized *newbuildings.* which is clearly a narrower market definition and would exclude some of the sales which Mr Booth said might be taken into account.

65.    The experts each gave evidence of a number of sales which were said to be relevant to the exercise of determining the value of the Vessel at or shortly after the time of the breach. There is no doubt that if there was an available market at all it was a very thin market indeed. The freight indices at the time were at extremely low levels and there appears to have been little activity in the market for second hand built handy sized bulk carriers, still less for Japanese built newbuilding resales.

66.    Having assessed the evidence of the experts with care we have come to the conclusion that the "market" to be considered for these purposes is the market for Japanese built newbuilding vessels in the range 33,000 to 37,000 dwt within the period of 3 months after the breach (that is until mid May 2016). Whilst this may be a somewhat restrictive definition we consider that Japanese newbuildings would be evaluated by buyers differently from Korean or Chinese newbuildlings of the same type of vessel and would

18

command a premium in the market of perhaps 10% as compared with Korean newbuildings and up to 20% compared with Chinese newbuildings. A newbuilding vessel would be equipped with a guarantee from the shipyard and would command a premium compared to a second hand vessel which did not have such a guarantee. The premium attributable to this feature is difficult to assess but might amount to USD1 million or perhaps more (in the knowledge that shipbuilders often reserve some 5-10% of the contract price for guarantee liabilities depending on whether the ship is first of series or one of a long line of ships of the type). In this sense we prefer the evidence of Mr English who rejected the suggestion of Mr Booth that a Japanese newbuilding might effectively trade in the same market as a 4 year old Vietnamese built handy size vessel.

67.     Given the definition of what we consider to be the appropriate market parameters, it is clear that there was only one sale which might fall for consideration, namely the sale of Shimamani 614 in March 2016 reported at USD15 million. The only other sales which might conceivably have been considered were mv "Ocean Jewel" in January 2016 (reported at USD8.8 million) and mv " Maratha Premier" in October 2016 (reported at USD16.3 million). Neither of these were newbuildings. "Maratha Premier" was a 4 month old vessel but October 2016 seems to us to be too late to fall into consideration in determining whether there was an available market in February 2016.  "Ocean Jewel" was a 4 year old Korean built vessel so that, even though the date of the sale was close to the date of the breach, and although it is only necessary to have evidence of perhaps 2-3 sales to amount to evidence of a market, the age and place of build of the vessel are not really comparable. Also a single sale cannot in my view be taken as reliable evidence of the existence of a market in the dire conditions which prevailed in early 2016 and where sellers were doubtless unwilling to commit a vessel for sale except in a distress situation where the price would not in any event be representative of that between a willing buyer and a willing seller at arm's length.

68.     I accept the evidence of Mr English too that the sale of Shimamani 614 in March 2016 has features which raise questions whether it was truly a sale between willing buyer and

19

willing seller at arm's length. The sale was reported as having been coupled with a charter back to Japanese interests and may well have been reported at a price which enabled the shipyard from reporting a loss on the contract and not therefore at the true price (which might therefore have been lower). Again, even taken together I do not think that the sales of "Coean Jewel" and Shaimamani 614 provide reliable evidence that there was a market for Japanese newbuilding resale handy size bulk carrier vessels of between 33,000 and 37,000 dwt at or close to the date of the buyer's breach in this case.

69. My conclusion that there was not an available market means that section 50(3) of the Sale of Goods Act is not the prima facie basis for assessing the loss sustained by the Seller.  I find instead that the loss is prima facie to be determined by taking the assessed value of the Vessel at the date of the breach: Harlow and Jones Ltd v Panex (International) Ltd [1967] 2 Lloyd's Rep 509, 530 and AerCap Partners 1 Ltd. v Avia Asset Management AB [2010] EWHC 2431 at [105] to [117]. In making this assessment I have taken account of various indicators including the figures produced by shipbrokers Clarksons which indicate a figure of USD18 million in February 2016, Mr English's estimate of USD16.1 million to USD16.8 million based on the DSME resales or Mr Booth's estimate of USD16.6 to USD17.3 million based on the same information. I do not think that it is appropriate to consider averages between Clarksons' year end figures for 2015 and 2016 as suggested by Mr Kulkarni nor, possibly, a sale figure for "Audrey Tracy" in March 2017. Nevertheless, "Audrey Tracy" is a sister of the Vessel and so the best example of all the other vessels referred to by the valuation experts of what a buyer would actually be getting when compared to a sale of the Vessel at the date of the breach. "Audrey Tracy" was a year old when sold in March 2017 but Mr Booth accepted that if sold new at that time then her value would have been about USD18 million.

70. Although there is a significant element of estimation in the various figures, I have come to the conclusion that the appropriate figure to take as the assessed valued of the Vessel

at the date of the Buyer's breach I February 2016 is USD17.3 million being the upper figure estimated by Mr Booth.

**Assessment of Seller's loss**

71.   Given my conclusion that there was no available market, in my view the assessed value of the Vessel would ordinarily form the baseline for the assessment of the Seller's loss. The Buyer has of course challenged this on the basis that it does not take account of the disposal of the vessel by the Seller to Daiwan Kalon and that, when the retention of the down payment is taken into account, the Seller suffered no loss or a loss of only circa USD100,000.

72.   I have come to the conclusion that, although superficially seductive and well articulated, Mr Kulkarni's argument is wrong. Even if the inter-company MOA which was drawn up suggested that a cash price would be paid by Daiwan Kalon, this is clearly at odds with the terms of the transaction with the shipyard and evidence of Mr Hsueh as to how the transaction was treated as between the Seller and its subsidiary.  I also see the matter as follows.

73.   At its simplest, the parent effectively advanced to its subsidiary USDD20.9 million, being the cost of acquisition of the Vessel from the Shipyard, by way of inter-company loan. The subsidiary acquired the Vessel at a time when its assessed value was significantly less than the inter-company loan which it took on. For this purpose it is necessary to look at the market or assessed value of the Vessel (which I find to be USD17.3 million – see paragraph 76) rather than its book value which was apparently equal to the amount paid by the Seller to the Shipyard and the amount of the inter company loan. (i.e. USD20.9million).

74.   The result was that at the critical time, namely the date of the Buyer's breach, the subsidiary owed (and continues to owe) to the Seller USD20.9 million and had a ship

21

worth USD17.3 million. That would be the result of an immediate break—up of the assets and liabilities of the subsidiary on day 1 (the date at which the loss is to be determined). In simple terms the Seller has arranged a transaction whereby the subsidiary is induced to take a ship worth significantly less than the inter-company loan which the subsidiary takes on. This must be reflected in the corresponding negative value of Wisdom's shares in its subsidiary on a dollar for dollar basis.

75.   This transaction is not the same as an arm's length sale of the Vessel to a third party for cash, even if the subsidiary is able to trade the Vessel (at least temporarily) so as to generate positive cash flow and raise the possibility that over time the inter-company loan might be capable of being repaid as suggested by Mr Kulkarni for the Buyer. The value of the Seller's shareholding in the subsidiary is negative as a result of the transaction whereby the subsidiary has acquired the Vessel and the date of the Buyer's breach. This negative amount has to be taken into account in calculating the full amount of the parent's loss arising from the Buyer's breach. To calculate the totality of the loss suffered by the parent, the amount of the negative equity in the subsidiary needs to added to the difference between the price at which the ultimate buyer agreed to buy the ship and the amount paid to the Shipyard (The parent in fact already has funds in the form of the security deposit which exactly cover the latter deficiency).

76.   The later refinancing of part of the inter-company debt does not affect this negative equity position. The subsidiary borrowed USD16.72 million from Mega International Commercial Bank Co Ltd (the "**Bank**") secured by a mortgage on the Vessel and a guarantee from the parent. The USD16.72 million was paid by the Bank to the parent Seller. The effect was to repay to the parent Seller USD16.72 million of the originally USD20.9 million inter-company loan leaving USD4.18 million outstanding from the subsidiary to the parent. Following the refinancing, the subsidiary still has:

•   liabilities of USD20.9 million (USD4.18 million to the parent Seller and USD16.72 million to the bank) and

- an asset, namely the Vessel with an assessed value of USD17.3 million.

77. After the refinancing, the equity of the subsidiary (the value of its shares to the parent - the parent Seller's asset) is still negative by USD3.6 million (even if the parent has received cash from the Bank as a result of the refinancing of the inter-company loan).

78. If the Seller had not transferred the Vessel to the subsidiary the result would in effect have been the same. It would have paid USD20.9 million for a ship with a then value of USD17.3. Its loss would have been USD26.25 million less the market value of the Vessel. It has already received USD5.25 million which it can set off against this loss but it still leaves an uncovered loss of USD3.6 million which it is entitled to claim from the Buyer.

79. I agree with the Seller's contention that the transaction between the Seller and Daiwan Kalon was not properly a "sale" resulting in the elimination of the loss which would otherwise have been sustained, but even if I am wrong in this I agree with the further argument of the Seller that the transaction was, as a matter of law, *res inter alios acta.* The transaction came into existence independently of the Buyer's breach and was not legally caused by it. It came about because of the Seller's independent commercial decision to transfer the Vessel to Daiwan Kalon in accordance with its usual group internal practice. In such a case the transaction should be disregarded for the purposes of determining the loss sustained by the Seller: Kramer, The Law of Contract Damages (2nd ed, 2017) paragraphs 15-26, 26-196.

80. In its closing submissions the Buyer maintained that "*reasonable mitigation would require the innocent party to buy/sell at the market price. If they have not done that, they cannot recover additional loss on account of not having mitigated reasonably.*" . In this case however the Buyer's case is that there was no market because sellers were not prepared to commit their ships to sale in the dire conditions prevailing. The Seller

23

cannot in our view be criticised for not having done that which no other shipowner was prepared to do in the prevailing circumstances. The Buyer further argues that a key principle is that "a party cannot recover in respect of loss that has in fact been avoided". For the reasons expressed above the Seller's loss in this case has not been avoided by the acquisition of the Vessel by its subsidiary, as might for example have been achieved by a sale to a third party at arm's length.

81.    As I have said, I consider that the appropriate measure of loss in this case is the difference between the purchase price under the MOA and the assessed value of the Vessel (see paragraph 75 above). The Buyer has put forward the proposition that this falls to be displaced by the application of the compensatory principle adopted in The Golden Victory [2007] UKHL 12 and Bunge S.A. v Nidera BV [2015] UKSC 43. I do not agree. The circumstances in The Golden Victory and Bunge case were quite different from the present case. In both those cases the court was prepared to take into account subsequent extraneous events over which the parties had no direct influence in assessing a party's loss. That is not the case I am concerned with here, nor is there any reason in my view why the principles reflected in the cases referred to in paragraph 75 should not apply. Clearly the value of assets may fluctuate after a breach has occurred but that is the date at which the value of the relevant asset should be taken to be established in a case such as the present. I do not however in any case consider that the almost simultaneous transfer of the Vessel to the subsidiary in this case is such as to eliminate or reduce the Seller's loss as explained above.

**Interest**

82.    In exercising my discretion under section 49 of the Arbitration Act 1996 I consider that it is appropriate to award interest on the amount due at the rate of 5% per annum compounded with 3 monthly rests from 24 February 2016 until the date of final payment of the principal amount due by the Charterers.

**Costs**

83.    The Seller has substantially succeeded in almost all aspects of its claims and I see no reason to depart in this case from the normal rule that costs should follow the event. I therefore determine that the Buyer shall forthwith reimburse to the Seller the Seller's legal and other costs of the arbitration

**Dispositive Award**

84.    **NOW I**, the said Ian Gaunt, having taken upon myself the burden of this reference and having carefully and conscientiously read and considered the submissions (oral and written), oral and written evidence and documents put before me, and having discussed the matter with one another and found ourselves in agreement on the questions, **DO HEREBY MAKE, ISSUE AND PUBLISH** this my **PARTIAL FINAL AWARD** and **AWARD**, **HOLD, DECLARE, ORDER** and **DIRECT** as follows:

(1)    The Seller's claim succeeds in that the failure of the Buyer to take delivery of the Vessel when tendered by the Seller and the Buyer's failure to pay the balance of the purchase price of the Vessel to the suspense account as required by clause 3 of the MOA were repudiatory breaches of the MOA, entitling the Seller to bring the MOA to end, which it did, and to claim damages

(2)    The Buyer's counterclaim fails and is hereby dismissed.

(3)    There was no available market for a Vessel of the characteristics of the Vessel at or within a reasonable period of the breach of the MOA and the damages payable to the Seller by the Buyer are to be calculated by reference to the difference between the purchase price of the Vessel under the MOA (USD26.25 million) and the amount which I assess to be the value of the vessel at the assessed value of the Vessel at the time of the breach (USD17.3 million).

(4)   The amount payable by the Buyer to the Seller is therefore USD8.95 million less the amount of the down payment of USD5.25 million already made to the Seller and which the Seller is entitled to retain and apply against the damages payable.

(5)   The Buyer is further liable to pay to the Seller the amounts of:

(i)   USD135,000 in costs under clause 13 of the MOA in relation to the period between the date when the Vessel was tendered for delivery and the date when the MOA was terminated; and

(ii) USD27,000, being the cost of making alterations to the Vessel in order to be able to register it in the name of Daiwan Kalon.

(6)   The Buyer shall forthwith pay to the Seller the amount of USD8,950,000 plus USD135,000 plus USD27,000 less the amount of USD5,250,000 which the Seller shall be entitled to retain, thus a net payment amount of USD3,862,000.

(7)   The Buyer shall forthwith pay interest on the amount of USD3,862,000 at the rate of 5% per annum compounded with 3 monthly rests from 16 February 2016 until the date of payment in full of the principal amount and all interest.

(8)   The Buyer shall pay the full amount of the Tribunal's charges for this Final Award which I hereby fix in the sum of GBP16,650 (Sixteen thousand six hundred fifty pounds) provided that if any part thereof shall have been paid in the first instance by the Seller, the Seller shall be entitled to immediate reimbursement by the Buyer of the sum so paid together with interest from the date of such payment by the Seller until the date of reimbursement calculated at the rate of 5% per annum compounded with three monthly rests;

(9)   The Buyer shall pay the Seller's recoverable legal (including expert's) costs of this Final Award which, if not agreed, shall be determined by me under section

26

63(3) of the Arbitration Act 1996 on the basis set out in section 63(5) of the Act, for which we hereby reserve my jurisdiction;

(10) The Buyer shall pay interest to the Seller on the amount of such costs from the date of this Final Award until the date of payment of such costs, calculated at the rate of 5% per annum compounded with three monthly rests;

85. This Final Award is final as to the matters determined.

86. I reserve jurisdiction to make a further award or awards as may be appropriate in respect of all outstanding disputes between the parties in relation to the MOA.

**GIVEN** under my hand at the seat of the arbitration in London, England this 5th day of September 2018.

_____

**Ian Gaunt**